**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re CAPSULE INTERNATIONAL HOLDINGS LLC, *et al.*[1], | Case No. 13-13281 (CSS) |
| Debtors. | Chapter 11 Jointly Administered |
| CAPSULE INTERNATIONAL HOLDINGS LLC; CAPSULE GROUP HOLDINGS, INC.; CAPSULE INTERMEDIATE HOLDINGS, INC.; CAPSULE GROUP, INC.; CAPSULE INTERNATIONAL LLC; CAPSULE DE I, INC.; CAPSULE DE II, INC.; CAPSULE PA, INC.; CAPSULE FOREIGN HOLDINGS, INC.; and THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, | Adv. Pro. No. 15-_____(CSS) |
| Plaintiffs, | |
| v. | |
| DECHERT LLP, LOUIS IMBROGNO, MARK BORSETH, SOLUS ALTERNATIVE ASSET MANAGEMENT LP, BLACK DIAMOND COMMERCIAL FINANCE, LLC, JP MORGAN INVESTMENT MANAGEMENT, INC., and NORTHEAST INVESTORS TRUST, | |
| Defendants. | |

**COMPLAINT**

---

[1]      Capsule Group Holdings, Inc.; Capsule Intermediate Holdings, Inc.; Capsule Group, Inc.; Capsule International LLC; Capsule DE I, Inc.; Capsule DE II, Inc.; Capsule PA, Inc.; Capsule Foreign Holdings, Inc.; and Capsule International U.K. Limited (Foreign).

{BAY:02720264v2}

1.      This adversary proceeding arises from a fraud perpetrated on the Court and the unsecured creditors in these Constar bankruptcy cases.  The Dechert law firm conspired with Constar's insiders and a sub-set of its bondholders to create a bonus scheme that incentivized the insiders to breach their fiduciary duties by shifting asset sale proceeds away from unsecured creditors generally and toward a favored group of lenders. The defendants knew their scheme was improper, so they willfully and intentionally hid it from the Court, the Office of the US Trustee and the Official Committee of Unsecured Creditors.  Their conduct was outrageous.

2.      The plaintiffs seek disgorgement of Dechert's ill-gotten fees, compensation for actual damages, and sanctions and punitive damages for the defendants' ethical violations and other conduct that threatens and undermines the integrity of the judicial process.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction under 28 U.S.C. §§ 1334 and 157 because this proceeding is related to the above-captioned main bankruptcy cases (the "Constar Cases").

4.      This is a "core" proceeding under 28 U.S.C. § 157(b)(2)(A)-(C), (K), and (O).  The plaintiffs consent to entry of a final order or judgment by this Court.

5.      Venue is proper under 28 U.S.C. § 1409(a) because the related Constar Cases are pending in this judicial district.

## PARTIES

**The Plaintiffs**

6.      The "Plaintiffs" include each of the Debtors (defined below), except for Capsule International U.K. Limited (Foreign), and the Committee (defined below).

7.      "Constar," or the "Debtors," are, collectively, a group of companies that used to make plastic bottles and containers and are now the debtors in the Constar Cases. The Debtors' headquarters was Philadelphia, PA.  The individual Debtors are: Capsule International Holdings LLC; Capsule Group Holdings, Inc.; Capsule Intermediate Holdings, Inc.; Capsule Group, Inc.; Capsule International LLC; Capsule DE I, Inc.; Capsule DE II, Inc.; Capsule PA, Inc.; Capsule Foreign Holdings, Inc.; and Capsule International U.K. Limited (Foreign).  The "Constar" name was sold as part of the Debtors' asset sale.  Although the entity names were changed to "Capsule" as a result of the sale, the "Constar" name is used in this Complaint for historical accuracy and to avoid confusion.

8.      The "Committee" is the Official Committee of Unsecured Creditors appointed in the Constar Cases.  The Committee has standing to prosecute claims against "former and current insiders, employees and shareholders of the Debtors, and any insurance policy responsive to such claims (and the proceeds thereof) and any claims of the Debtors and their estates against the Debtors' pre-petition lenders."  Final DIP Order of January 16, 2014 [Case No. 13-13281; Docket No. 212].

**The Defendants**

9.      Each of the following defendants (collectively, "Defendants") may be served with process by any manner authorized by Federal Rules of Bankruptcy Procedure 7004.

10.      "Dechert" is Dechert LLP, a law firm and Pennsylvania limited liability partnership whose principal place of business is in Philadelphia, PA.  Dechert is the former lead bankruptcy counsel to the Debtors in the Constar Cases.  The individual Dechert partners most responsible for that firm's conduct in these cases are:

Michael J. Sage, admitted to practice in New York;

Brian E. Greer, admitted to practice in New York;

Eric S. Siegel, admitted to practice in Pennsylvania and New Jersey; and

Michael S. Doluisio, admitted to practice in Pennsylvania and New Jersey.

Each of these attorneys are subject to the rules of professional responsibility in the jurisdictions in which they are admitted to practice, including the duty of candor to the Court.  Sage and Greer are also subject to the rules of professional responsibility of the District of Delaware in the Constar Cases because each of them appeared *pro hac vice* in this Court.

11.    The "Conspiring Bondholders" are, collectively, Solus, Black Diamond, JP Morgan and Northeast (as each is defined below), and together hold 91% of the Debtors' "Secured Debt," which is comprised of (i) $26,760,363.63 in aggregate principal amount pursuant to that certain Credit Agreement dated as of May 31, 2011 (as amended, supplemented or otherwise modified on or before December 18, 2013) ("Shareholder Credit Agreement") and (ii) $43,239,636.36 in aggregate principal amount pursuant to that certain Note Purchase Agreement, dated as of May 31, 2011 ("Shareholder Note Purchase Agreement").  As a result of Constar's prior bankruptcy cases, during which some lenders swapped debt for equity, the Conspiring Bondholders hold equity interests in Constar International Holdings LLC ("Constar Holdings"), the ultimate parent of the Debtors' corporate group.  The Conspiring Bondholders also have rights under the Limited Liability Company Agreement of Constar Holdings.

12.    "Black Diamond" is Black Diamond Commercial Finance LLC, a Delaware limited liability company with its principal place of business in Stamford, CT.

Black Diamond is also the agent for the lenders on the Secured Debt facilities.  Black Diamond holds approximately 37% of the equity of Constar Holdings.

13.    "JP Morgan" is JP Morgan Investment Management, Inc., a Delaware corporation with its principal place of business in New York, NY.  JP Morgan holds approximately 10% of the equity of Constar Holdings.

14.    "Northeast" is Northeast Investors Trust, a Massachusetts trust with its principal place of business in Boston, MA.  Northeast holds approximately 10% of the equity of Constar Holdings.

15.    "Solus" is Solus Alternative Asset Management LP, a Delaware limited partnership with its principal place of business in New York, NY.  Solus holds approximately 20% of the equity of Constar Holdings.

16.    The "Conspiring Officers" are, collectively, CEO Imbrogno and CFO Borseth (as each is defined below).

17.    "CEO Imbrogno" is Louis Imbrogno, an individual and former chief executive officer of Constar.

18.    "CFO Borseth" is Mark Borseth, an individual and former chief financial officer of Constar.

## FACTS

**Summary**

19.    The Conspiring Officers, who faced losing their jobs as Constar collapsed, wanted to secure for themselves outsized, severance-style bonuses.  Dechert, which was ostensibly hired to represent Constar as a whole, instead devoted substantial efforts to arranging these bonuses against Constar's interests and for the personal benefit of the Conspiring Officers.  The Conspiring Bondholders, who initially balked at the giveaway,

eventually joined the scheme so they could structure the bonuses to incentivize the Conspiring Officers to breach their fiduciary duties and divert sale proceeds to the Conspiring Bondholders at the expense of non-conspiring creditors. The Defendants knew that the Court would never authorize this, so they purposefully hid the details from the Court and everyone else who might object. They committed fraud.

**Pre-Petition Efforts to Secure Cash Payments to Management**

20.     The Conspiring Officers were looking out for their own financial interests well before Constar filed its bankruptcy petitions on December 19, 2013.

21.     Constar was no stranger to bankruptcy, having gone through the process in 2008 and 2011. By mid-2013, it was in trouble again. The lingering effects of the recession and the loss of a major customer created a liquidity crisis at Constar. Everyone anticipated bankruptcy.

*The Conspiring Officers Concoct A Sham "Incentive" Bonus System*

22.     Constar's management had employment contracts that provided for generous severance payments ranging from 65% to 100% of annual salary.

23.     Constar's management knew that in bankruptcy they might lose their rights to contractual severance payments. This risk existed because a debtor in bankruptcy can "reject" burdensome contracts.

24.     In an effort to shield their contractual severance payments from the bankruptcy process, Constar's management devised a plan to replace contractual severance payments with "incentive bonuses" that management thought would survive bankruptcy.

25.     On October 25, 2013, Constar management approved a plan to pay "incentive bonuses" totaling $2.5 million to 11 "key employees" and other, non-officer employees.

26.     Despite being called an "incentive" plan, it provided no formulas or metrics to tie bonuses to performance.  Instead, the plan simply awarded Constar's management "bonuses" in the amount of the severance payments provided for in their employment contracts.  For example, Constar's general counsel would receive an "incentive" bonus of $260,000, which was equivalent of his contractual severance amount.  The plan similarly provided for management and officer "bonuses" in amounts equal to 65% to 100% of base salary, which tracked amounts those employees would have received in severance under their existing employment contracts.

27.     Constar's management knowingly and intentionally devised this plan for the sole purpose of insulating their contractual severance bonuses from the bankruptcy process.  Constar's general counsel addressed the issue in an email to colleagues:

> Can we just build into this new incentive
> agreement a waiver and release of all prior
> severance/change in control benefits? Either
> the employee signs it or they take their
> chance with the prior agreement that may
> either be rejected in the BK or be of no
> value outside of a BK due to the financial
> situation of the company.

### *Dechert Looks Out For The Personal Financial Interests Of Conspiring Officers*

28.     Constar's outside counsel, Dechert, was eager to help.  The Conspiring Officers had recently selected Dechert to represent Constar in its restructuring and bankruptcy process.  This was, potentially, a very lucrative engagement for Dechert.  And Dechert was surely grateful to the Conspiring Officers for causing Constar to hire them.

29.    From the beginning, the Conspiring Officers and Dechert worked together to secure a bonus plan for management, which they called a "KEIP."

30.    "KEIP" stands for Key Employee Incentive Plan.  Such plans are common in large chapter 11 bankruptcy cases.  Generally speaking, these plans provide for special compensation to a debtor's top management as an incentive to accomplish certain goals, such as the successful sale of assets.  Courts are skeptical of KEIPs because they provide cash to insiders at the expense of creditors.  There is significant risk of abuse and self-dealing among management.  Congress addressed this directly with amendments to the Bankruptcy Code that set limits on what sorts of KEIPs are allowed.  *See* 11 U.S.C. § 503(c).  This Court issued an opinion approving of a KEIP in another case, but only after scrutinizing the plan for compliance with the requirements of section 503(c) and relevant case law.  *See* Order Approving Performance-Based Incentives For Key Employees, *In re: Orchard Supply Hardware Stores Corp.*, No. 13-11565 (Bankr. D. Del. Aug. 6, 2013) (Sontchi, J.) ("*Orchard Supply*").

31.    On October 29, 2013, CEO Borseth negotiated Constar's retainer agreement with Dechert's Eric Siegel.  Constar's general counsel wrote in an email:

> I also let [Siegel] know that Dechert was to do no work unless authorized by you or I. The APA and KEIP work is costing us some money!

An "APA" is an asset purchase agreement.  The email shows that Dechert was spending dwindling estate resources on management's KEIP.

32.    Dechert devoted substantial resources to helping Constar's management get their personal bonuses.  Constar's general counsel remarked in a November 13, 2013,

email that Dechert's advice regarding the KEIP had already cost "around $110k." CFO Borseth responded to acknowledge, "[a]s you point out, we spent a lot on the KEIP."

33.    Ultimately, Dechert charged Constar $1,421,520.44 during the 90 days prior to Constar's bankruptcy filing.  Much of that was spent chasing bonuses for insiders.

34.    Dechert considered a range of techniques to "give executives 100% certainty they will be paid bonuses."  Dechert negotiated with Latham & Watkins, which then represented Constar's board.  They considered structuring the bonuses as a "gift" to the employees, "setting up an L/C [letter of credit]" and "making the employees secured creditors in consideration for continued employment."

35.    Dechert's laser-like focus on the KEIP ran against its duty as counsel to Constar as a whole.  Even Dechert's engagement letter acknowledged the firm's role as counsel to Constar and that "acceptance of the Restructuring Representation does not involve an undertaking to represent any of the Constar Companies' individual directors, officers, employees, members or shareholders . . . ."

36.    If the KEIP were truly designed to benefit Constar as a whole, it would have included incentives or conditions designed to benefit Constar and its creditors. Dechert never pushed for any those things.  Instead, Dechert was only looking out for the interests of the Conspiring Officers and other management, to the detriment of its client.

*Conspiring Bondholders Introduce Pro-Bondholder Incentives Into The KEIP*

37.    Because Constar was insolvent, any sort of KEIP had to be approved by Constar's secured lenders, the bondholders.  The Conspiring Bondholders held 91% of the bonds.  The decision to fund cash bonuses for management was effectively theirs to make.

38.     On November 5, 2013, Dechert sent a first draft of the KEIP to Kirkland & Ellis, who was then counsel to three of the Conspiring Bondholders: Solus, JP Morgan and Northeast.

39.     The draft was structured as a letter agreement between Constar's management and Constar's lenders.  Notably, Constar itself would not be a party to the agreement, even though Constar's counsel, Dechert, was spending Constar's money to negotiate the agreement.

40.     The November 5 letter proposed general terms for the KEIP:

> In order to encourage your continuing commitment to and support of the Company through the consummation of a sale of all or substantially all of the assets or equity interests of the Company (a "Sale of the Company"), the undersigned bondholders (each, a "Bondholder" and, together, the "Bondholders") are pleased to offer you this transaction bonus opportunity on the terms and conditions set forth in this letter agreement (the "Agreement").
>
> Provided that (i) you continue to be employed by the Company until the closing date of a Sale of the Company or (ii) your employment is terminated by the Company without Cause . . . prior to the closing of a Sale of the Company, the Bondholders agree to pay you from the proceeds of such Sale of the Company, a transaction bonus in the amount of $[          ] (the "Transaction Bonus"), subject to any statutory withholding that is required by applicable law, at the closing of such Sale of the Company.
>
> . . . .
>
> In addition, you agree to provide such cooperation as the Company may reasonably request, if needed, should the Company

```
                determine   to   seek   court   approval   of   this
                Agreement.
```

41.     The Conspiring Bondholders rejected Dechert's proposal for mere retention bonuses.  Instead, the Conspiring Bondholders wanted to incentivize Constar's management to look out for bondholder interests by tying the bonus payments to distributions to bondholders.

42.     Dechert partner Siegel prepared a revised draft of the KEIP that moved in that direction by providing that the bondholders would pay the bonuses out of Constar's asset sale proceeds.  His draft stated that KEIP payments would be made from "the proceeds of the Sale Transactions belonging to the Bondholders at the time the first $2.5 million of such proceeds in respect of the Shareholder Debt is to be distributed to the Bondholders."

### *The Conspiring Officers Attempt To Hold The Sale Process Hostage*

43.     KEIP negotiations between Constar management and the Conspiring Bondholders were contentious.  The Conspiring Officers tried to pressure the Conspiring Bondholders by holding the asset sale process hostage until a KEIP was agreed.

44.     October 31, 2013, Constar's financial advisors, Lincoln International ("Lincoln"), asked for a meeting to discuss Constar's preparations for an asset sale and bankruptcy.  CFO Borseth responded with an email stating his ransom for the sale process to advance:

```
                As we discussed – gating items is [sic] KEIP
                resolution  to  facilitate  'open  the  kimono'
                meeting   here   to   get   others   working
                internally.
```

45.     CFO Borseth repeated his threat to prevent the sale process from advancing until the KEIP was agreed.  He emailed Dechert attorney Sage:

> As you know, [the KEIP] is a gating item to
> really getting started (in addition to
> getting a signed letter with Amcor).

46.    CFO Borseth expressed the same position in an email to Constar's general

counsel.  In response to a request from a potential asset purchaser for a field visit to

review Constar's facilities, CFO Borseth wrote:

> I don't see any way we are in a position to
> do this by Monday.  As we have discussed . .
> . **No KEIP resolution** . . . . We can discuss
> on our meeting tomorrow morning – but this
> needs to slow down.

(emphasis added).

47.    The emails leave no doubt.  The Conspiring Officers threatened to obstruct

Constar's asset sale process unless their personal bonuses were guaranteed.

48.    On November 25, 2013, Constar's general counsel emailed CFO Borseth

to lay out priorities as Constar attempted to sell its assets and as bankruptcy drew closer.

He wrote:

> Totally agree.  We must prioritize.  From my
> perspective the order is:
>
> 1.    Do the necessary to maintain some level
> of Wells funding;
>
> 2.    Run the business and keep it intact;
> **this includes the execution of the KEIP**;
>
> 3.    Complete the data room and requests
> from Amcor;
>
> 4.    Do whatever is necessary to get the APA
> signed;
>
> 5.    Work on the DIP and supporting
> documents;
>
> 6.    Work on first day motions;

```
7.    Work on the CIP for Europe;

8.    Work on SOFA's
```

(emphasis added).

49.     The email confirms that Constar's management prioritized the KEIP above the sale process, and even above preparations for the bankruptcy filing itself.

50.     As of December 13, 2013, Dechert's Sage reported to CEO Imbrogno that there was still no agreement with bondholders on a KEIP.

51.     By December 16, 2013, just two days before the bankruptcy filing, the Conspiring Officers' frustration at a lack of a KEIP boiled over into rage. CEO Imbrogno emailed Dechert to complain about bondholder Black Diamond:

> I hope those pricks give us the word tonight so we can file.. And issue WARN notices.. we are probably closing Holland tomorrow.. Sorry I am pissed about 800 plus people.. And our vendors.. And amcor didn't help.. Just think BD giving us consent this am at 725 am for customer visits.. These are not good folks.. Phil resigning a week ago.. All the bullshi- of DIP Financing and posturing.. What a sham. **And last 2 weeks on a KEIP?**

(emphasis added).

**Post-Petition Efforts To Secure Insider Bonuses**

52.     Constar filed its bankruptcy petitions on December 19, 2013, with no KEIP in place.  The bankruptcy filing did nothing to quell the Conspiring Officers' quest for personal enrichment.  If anything, it accelerated it.

53.     Soon after the bankruptcy filing, CEO Imbrogno wrote to Dechert on December 29, 2013, to encourage renewed focus on getting a KEIP in place:

> The office and the plants are very tender in
> that some folks recognize they will not have
> a job in the near term whatever happens and
> we have lost 3 key management personnel
> already.  The senior team members are quite
> frankly upset with the way the BH's have
> left them to run a company, to insure a sale
> or in the case of Europe sell it, with
> minimal funding, customer issues to manage,
> supply chain challenges to say the least and
> **no stay bonus or agreement on the KEIP
> program**.  I am asking these people to do go
> beyond the norm and many will not have jobs
> when the process is complete.

(emphasis added).

### *The Conspiring Officers Attempt To Hold The DIP Financing Process Hostage*

54.    Having failed in their attempt to force a pre-petition KEIP by stalling the asset sales process, the Conspiring Officers tried to take another hostage: DIP financing.

55.    "DIP financing" refers to debtor-in-possession financing that a debtor in a chapter 11 bankruptcy obtains to continue funding operations during the bankruptcy process.

56.    Timing was critical.  Without quick approval of a financing package, Constar faced liquidation at fire-sale prices, as opposed to an orderly asset sale that would provide greater value to creditors.  The Court set a hearing on DIP financing for January 9, 2014.

57.    Dechert's Sage, anticipating that the Committee would seek a continuance of the DIP hearing so that it would have "time to get up to speed," nevertheless advised Constar management in an email on January 6, 2014, to oppose any delay in the DIP hearing.  In the same email, Sage also noted his disparaging opinion of the Court's anticipated handling of the DIP financing.

58.    Constar had a choice between Solus and Black Diamond as potential DIP lenders.

59.    On January 6, 2014, three days before the DIP hearing, Dechert's Sage sent the Conspiring Officers the DIP financing agreement proposed by Solus.

60.    CFO Borseth indicated in emails with Dechert that, without a KEIP, he would delay his review of the Solus proposed DIP financing agreement, thereby making it impossible for approval of an agreement at the January 9, 2014, hearing.

61.    The Conspiring Officers intended to leverage the DIP financing process to ensure a KEIP for their own personal benefit.  CEO Imbrogno explained to Sage on January 9, 2014:

> If we ever felt we had **a small bargaining chip** how would I ever put a stay package in for the team to truly motivate this group, especially as the time frame is extended and the interested parties expanded?  This is not about greed, its about doing the right thing.

(emphasis added).  The phrase "stay package" referred to the KEIP.

62.    CFO Borseth agreed.   After CEO Imbrogno forwarded him the email above, CFO Borseth responded to say "you know what they say about great minds."

63.    CFO Borseth also emailed CEO Imbrogno and Sage together about the possibility of leveraging the DIP financing to obtain a KEIP:

> **I smell an opening**
>
> We clearly have two parties fighting to control our situation through the funding of the DIP
>
> . . .

> Wether [*sic*] they see the possibility of a
> good auction that will give them more
> proceeds than they previously thought or
> it's an ego thing between them I don't know
> - but it seems to me **before we pick a DIP
> winner we take another swing at the KEIP**.
>
> **We seem to have a little leverage now** and if
> we don't do now I don't know when.

(emphasis added).

64.    With Dechert's help, the Conspiring Officers pressed for a KEIP as a condition to approval of DIP financing.  Soon after the DIP financing was approved, they got their wish.

### *The Conspiring Officers Negotiate A KEIP With Black Diamond*

65.    The DIP financing process was drawn-out and contentious.  The Conspiring Officers originally tried to select Solus as the DIP lender even though their financing package offered worse terms for many interested parties.  The Conspiring Officer's choice was largely driven by their anger at Black Diamond's refusal to agree to a KEIP up to that point.

66.    After a substantial amount of time spent by all parties and a contested DIP financing hearing held on January 14, 2014, Constar eventually selected Black Diamond as its DIP lender.  The Court approved the selection by order dated January 16, 2014.

67.    Immediately after the hearing, William Allen, a Constar director selected by Black Diamond, emailed CFO Borseth:

> Now we can take a look at the keip

68.    The next day, Allen emailed CFO Borseth and CEO Imbrogno about a KEIP:

> [S]tart to think about a bonus based on the
> size of the European operation.

69.     CFO Borseth then proposed a KEIP with total bonuses of $2 million, of which $1 million would be guaranteed, and $1 million would be based on the proceeds from an asset sale.     CFO Borseth explained the personal financial benefit to the Conspiring Officers of his proposal in an email to CEO Imbrogno:

> In addition to a **guaranteed payout**, what I like about this approach is whatever the working capital adjustment is, whatever the professional fees are, what the final DIP balance is, **all the things that could change between estimates and what the deal actually is, etc. . . . are taking [sic] into account in setting the floor**. Incremental employee payout is not at risk for these things. We then participate in the upside above whatever that number is if the auction is successful.

(emphasis added).  In other words, the Conspiring Officers proposed a KEIP where the payouts were not incentives at all, but instead were all but certain to be paid in full.

70.     On February 3, 2014, Black Diamond counter-proposed a different KEIP. The maximum payout would be $2 million, but none of it would be guaranteed.  Instead, the first $1 million would be paid only if the asset sale proceeds exceeded $81 million. The second $1 million could be earned only if the bondholders received more than the $19 million of proceeds.  The bonus would be 5% of the proceeds above $19 million.

71.     Black Diamond's proposal called for Court approval, a process that would require notice and disclosure to the Court, the Committee and the Office of the US Trustee.

72.     Like Black Diamond, CFO Borseth knew that Court approval would be necessary if bonuses were paid from the Debtors' bankruptcy estates and characterized as

"administrative expense claims."  The problem was that the Court would never approve the KEIP.  CFO Borseth explained in an email to CEO Imbrogno:

> These payments are not being made out of proceeds to the shareholders but instead will require court approval as administrative expense claims which puts us ahead of unsecured creditors as well. **Unsecured creditor committee among others will need to weigh in on this and they won't see it favorably since we are so late in the case they will argue a KEIP is not needed.** Anyway, not as simple as simply taking these proceeds out of the bondholders share of the proceeds which they can dictate.

 (emphasis added).

73.    Dechert also knew the KEIP could not get Court approval as it was then formulated.  Dechert's Sage, rather than improve the KEIP to make it comply with the requirements of the Bankruptcy Code, instead sought to avoid Court approval entirely by characterizing the payment as one by the Conspiring Bondholders themselves.  Sage emailed Black Diamond to ask:

> when we conceived of and agreed upon a keip pre-petition, the concept was a carveout from the four largest holders without court approval.  If this is not what you intend, why is that? Or am I misunderstanding this?

**The Conflict Of Interest In The KEIP**

74.    The Conspiring Officers, with Dechert's help, eventually reached an agreement with the Conspiring Bondholders on a KEIP.  Unfortunately for Constar and its creditors, the agreed terms of the KEIP created an irreconcilable conflict of interest and incentivized the Conspiring Officers to breach their fiduciary duties and shift sale proceeds to the Conspiring Bondholders.

*The Agreed Terms Of The KEIP*

75.    Agreement on the terms of a KEIP was reached in February 2014.

76.    Counsel for Black Diamond, which was tasked among the Conspiring Bondholders with negotiating the KEIP, sent Dechert an email with the following KEIP terms attached:

> The terms of a proposed key employee incentive program ("KEIP") for Constar would be as follows:
>
> 1. The maximum amount payable under the KEIP would be $2 million.
>
> 2. Up to $1 million (the "Closing Incentive Payment") would be earned and payable to eligible KEIP participants upon the closing of a transaction or series of transactions resulting in the receipt by the Constar estates of gross cash sale proceeds of not less than $81 million. If all KEIP Participants are eligible to receive the Closing Incentive Payment, the payment would be $1 million. The Closing Incentive Payment shall be 5.3% of the Shareholder Creditor Net Cash Sale Proceeds up to a maximum amount of $1 million, assuming all KEIP Participants are eligible to receive the Closing Incentive Payment.
>
> 3. Up to an additional $1 million (the "Price Increase Incentive Payment") would be earned and payable based on the Shareholder Creditor Net Cash Sale Proceeds payable to the shareholder creditors in excess of $19 million prior to taking into account the payment under the KEIP (such amount, the "Shareholder Increased Distribution"). The amount payable based on the Shareholder Increased Distribution shall be 5% of the Shareholder Increased Distribution up to a maximum amount of $1 million, assuming all

KEIP Participants are eligible to receive the Price Increase Incentive Payment.

    a. "Shareholder Creditor Net Cash Sale Proceeds" means the amount of actual cash that would be distributed to Shareholder Creditors resulting from the sale of the Debtors' US assets and the sale or liquidation of the Debtor's foreign assets but for the payment of the Price Increase Incentive Payment (i.e., net of all administrative expense claims, repayments of the DIP facilities, repayment of the Roll Over Creditors, repayment of the Wells Fargo ABL Facility, and any and all other amounts deducted from sale proceeds prior to distribution to Shareholder Creditors).

    b. For example, if Shareholder Creditor Net Cash Sale Proceeds equal $26.5 million, then the maximum amount of the Price Increase Incentive Payment would be $375,000, with the amount paid to Shareholder Creditors reduced from $26.5 million to $26.125 million if all KEIP participants are eligible for a share of the Price Increase Incentive Payment.

4. The Closing Incentive Payment would be earned upon receipt by the Debtors' estates of gross sale proceeds as described in item 1 above and payable contemporaneous with the payment of Shareholder Creditor Net Cash Sale Proceeds from such sale or sales to the Shareholder Creditors. The Price Increase Incentive Payment would be earned and payable contemporaneous with payment of Shareholder Creditor Net Cash Sale Proceeds to the Shareholder Creditors, including on multiple occasions if there are multiple distributions to Shareholder Creditors.

5. Both the Closing Incentive Payment and the Price Increase Incentive Payment would be paid as a carve out from the distributions to Shareholder Creditors.

   a. This proposal is conditioned on all Shareholder Creditors other than the so-called 9% agreeing to the carve out.

6. The employees eligible to participate in the Closing Incentive Payment and the Price Increase Incentive Payment would be set forth on the schedule agreed to by the parties and approved by the bankruptcy court (the "KEIP Participants"). In order to be eligible to receive either the Closing Incentive Payment or the Price Increased Incentive Payment, a KEIP Participant must be an employee of the debtors at the time of the payment and must have agreed to waive all incentive and severance payments under such employee's existing employment agreement, if any.

   a. If any KEIP Participant is not eligible to receive either the Closing Incentive Payment or the Price Increased Incentive Payment, then such KEIP Participant's share of the Closing Incentive Payment or the Price Increased Incentive Payment shall be reduced from the total amount of the Closing Incentive Payment or the Price Increased Incentive Payment, as applicable, and distributed to the Shareholder Creditors.

77.   The "Shareholder Creditors" referred to in the KEIP are the bondholders, including the Conspiring Bondholders, who together held 91% of the bonds.

78.    The KEIP calls for cash payments directly to the Conspiring Officers and other Constar management based on the proceeds of the asset sale received by the Conspiring Bondholders.

### *The Committee Challenge*

79.    Just days before the KEIP's terms were finalized, on February 3, 2014, the Committee sent a letter to counsel for the Conspiring Bondholders to inform them that the Committee objected to the Conspiring Bondholders assertion of valid and perfected liens on all of the assets that would be sold (the "Committee Challenge").

80.    The Committee Challenge questioned the perfection of liens on several groups of assets including certain real estate, personal property and foreign intellectual property rights (the "Foreign IP").   The Foreign IP included hundreds of patents and trademarks in over 20 countries held by the Constar U.S. entities.

81.    The Committee Challenge revealed that the interests of the Conspiring Bondholders – Constar's secured lenders – diverged from the interest of Constar's unsecured creditors, to whom Constar's management owed its fiduciary duties.

82.    As secured lenders, the Conspiring Bondholders stood first in line to receive the sale proceeds for their collateral.  However, if the sale were to include assets that were not covered by the Conspiring Bondholders' lien, then the portion of the proceeds attributable to the unencumbered assets would be distributed among the unsecured creditors equally.

83.    As a result, the proposed sale of assets would require Constar to allocate the sale proceeds between encumbered and unencumbered assets.   The higher the valuation ascribed to the encumbered assets, the greater the share of the sale proceeds that would be allocated to the Conspiring Bondholders.

84.     The Conspiring Bondholders knew all of this, and that is why they engineered the KEIP to reward the Conspiring Officers based on recovery by Conspiring Bondholders as a group, rather than based on the total sale proceeds.  The KEIP created a direct incentive for management to breach its fiduciary duties to unsecured creditors by overvaluing the encumbered assets.

85.     Dechert, for its part, knew or should have known that such an arrangement created a conflict of interest and an incentive for the Conspiring Officers to breach their fiduciary duties.   Rather than step in and modify the KEIP to comply with the law, Dechert ignored its own fiduciary duty to its client and its ethical obligations and supported the proposed KEIP.

**Dechert And The Other Defendants Intentionally Deceive The Court**

86.     Dechert knew that Court approval of the KEIP was required under section 503(c) of the Bankruptcy Code.  Dechert also knew the Court would not approve a KEIP with inherent conflicts of interest and incentives to breach fiduciary duties.  Dechert's solution was to deceive.

*Dechert's Knowledge Of The Duty To Disclose The KEIP To The Court*

87.     There is no question Dechert was at all times fully aware of its obligation to disclose the KEIP to the Court and all parties in interest.

88.     Dechert's Sage was directly involved in at least two cases where KEIPs were proposed by chapter 11 debtors.  In May 2012, Sage was lead debtor's counsel in *In re Velo Holdings Inc.* (Bankr. S.D.N.Y. 12-11384).   In *Velo Holdings*, the holding company for direct marketer Vertrue LLC, the debtors, sought bankruptcy court approval of a key employee incentive plan.  Notice of the motion seeking approval of the incentive plan in *Velo Holdings* was provided in accordance with the case management order

23                          **Original Complaint**

entered by the bankruptcy court in *Velo Holdings'* Chapter 11 cases.  The motion, through which the debtors requested approval of the key employee incentive plan, included an 8-page disclosure of the proposed incentive plan's terms.  Separately, Sage represented secured lenders in the *Orchard Supply* case in this Court.  *In re Orchard Supply Hardware Stores Corp.* (Bankr. D. Del. 13-11565) (Sontchi, J.).  The *Orchard Supply* debtors sought court approval of a key employee incentive plan.  Notice of the motion seeking approval of the incentive plan in *Orchard Supply* was provided in accordance with the local rules of the Bankruptcy Court for the District of Delaware.  The motion, through which the debtors requested approval of the key employee incentive plan, included a 6-page disclosure of the proposed incentive plan's terms.  Dechert's involvement in these cases shows it knew how to follow the rules when it wanted to.

89.    Dechert demonstrated its awareness of these obligations early in this case, too.  On October 30, 2013, well before the bankruptcy filing, Dechert sent a memorandum to Constar's management discussing KEIPs that were recently approved by bankruptcy courts in cases similar to Constar's anticipated bankruptcy.  The memorandum was circulated at exactly the same time that Dechert was actively helping the Conspiring Officers negotiate their KEIP with the Conspiring Bondholders.  On November 7, 2013, Dechert's Greer wrote to Sage and Siegel to caution them further that the details of the KEIP "will need to be disclosed" to the Court.

### *The Scheme To Hide The KEIP From The Court*

90.    The Court set a hearing on the proposed sale of Constar's assets for February 10, 2014.  Because the KEIP would be funded from the sale proceeds, the Defendants knew they would have to disclose it to the Court.

91.     Dechert knew that disclosing the KEIP would kill it.  On February 3, 2014, Dechert's Greer wrote to Sage an email:

**RE: Constar KEIP Proposal Attached**

```
. . .

I am worried we could not get approval at
this stage for this.
```

(emphasis added to the subject line of the email).

92.     Dechert decided to conceal the KEIP from the Court, the Office of the US Trustee and the Committee, in the hope of slipping it into the asset sale package unnoticed.

93.     CEO Imbrogno suggested to Sage and Greer in an email:

```
As discussed I want to start referring to
the bonus as a Success Bonus, if u guys
agree.
```

The goal of the new terminology was to obfuscate the true nature of the proposed KEIP.

94.     As the sale hearing approached, Dechert rejected a suggestion by counsel to the Conspiring Bondholders to read the KEIP terms into the record.  Sage wrote in an email:

```
I don't know if we need to read in every
word.
```

95.     Dechert's Greer agreed about limiting the disclosure of the KEIP, writing:

```
It think it should be as minimal as possible
at the hearing—I don't want to incentivize
sontchi [sic] to ask us to file a motion.
```

96.     Counsel to Black Diamond, one of the Conspiring Bondholders, eventually agreed:

> I would leave off the formulas and some of
> the similar details . . .

97.    The KEIP "formulas" were, of course, the provisions that tied bonus

amounts to bondholder recoveries.  The "formulas" were the essence of the KEIP.

98.    Dechert and the Conspiring Officers exchanged emails the on the eve of

the sale hearing.  On February 9, 2014, the day before the hearing, Greer emailed Sage:

> The keip is toast if we have to talk more
> than 2 minutes about it

99.    Sage responded, sarcastically:

> I dunno.   I have confidence in you!
> Seriously, it's not a keip . . . .

100.    Greer responded again:

> Right.  Once we talk more than a minute it
> is a keip and we lose.

101.    This email exchange is nothing short of remarkable.  Dechert's partners –

attorneys admitted to the bar, bound to uphold ethical standards, and officers of the Court

– explained in their own words that they will not tell the Court crucial details of the KEIP

because they knew that if the Court heard those details, it would reject the KEIP.

102.    At the hearing, Greer carried out Dechert's plan to deceive the Court.  The

following is the sum total of what Greer said about the KEIP:

> In light of the success of the auction,
> certain of the Noteholders which are really
> everyone other than the 9% they're not
> participating in the DIP have agreed to fund
> a success bonus for members of management
> out of their proceeds of distributions.
>
> It's not proceeds coming from the bankruptcy
> estate.

```
And we're not asking the Court to take any
action on that today, but I wanted to just
disclose that for the record.
```

103.    The disingenuousness of Greer's statement to the Court is breathtaking.

Here is a breakdown of Greer's representations to the Court on a lie-by-lie basis:

a.    Greer describes the KEIP as "success bonuses," using the language the Defendants previously agreed on to hide the true nature of the KEIP.

b.    Greer suggests the bonuses were based on the "success of the auction" without disclosing the critical detail that the bonus amounts were incentives to management to improperly favor the Conspiring Bondholders over other creditors.

c.    Greer describes the payments as not coming from the bankruptcy estate.  That is flat wrong because, as described below, the bonus payments were ultimately paid from the estates and not by the bondholders.

d.    Greer says he is not seeking Court action "today," suggesting that a proper motion for approval of the bonuses is forthcoming.  Dechert never intended to seek Court approval of the KEIP, and never did.

e.    Greer concludes by hiding his deception in a cloak of candor: "I just wanted to disclose that for the record."

104.    For his part, Sage was delighted at the success of the deception.  Sage emailed CEO Imbrogno during the hearing:

```
I'm listening in to the hearing.  Hugely
good that the Judge didn't pause on that and
```

```
no one got up to object.  We're largely
there.
```

105.    Of course no one got up to object.  No one *knew* about the KEIP because the Defendants had conspired to keep it a secret.

106.    Sage, within hours of lauding his partner's deceptive use of the term "success bonuses" in Court, himself referred to the KEIP as a "KEIP" in an email to the Conspiring Bondholders.  In an email with the subject line "Constar KEIP," Sage wrote to inform counsel to the Conspiring Bondholders that the KEIP was "referenced" at the sale hearing and to remind them:

```
your clients agreed to the attached prior to
the hearing
```

107.    It was not enough to lie to the Court about the KEIP.  Dechert even lied to its clients.  Following the sale hearing, CEO Imbrogno falsely told Constar's director Allen that the KEIP "was entered in the record" at the sale hearing.  Sage, who was copied on the email, knew full well it was not.  Sage did not correct CEO Imbrogno's false statement, thus potentially leaving Allen with the false impression that the KEIP was approved by the Court.

**The Defendants Paid The KEIP Directly From The Debtors' Estate**

108.    Contrary to Dechert's representations to the Court at the sale hearing, KEIP bonuses were not paid by the bondholders, but were funded directly from the Debtors' estate.

109.    Counsel for certain of the Conspiring Bondholders anticipated this, writing the following in an email to Dechert:

```
two funds specifically raised a preference
for the bonus amounts appearing on a closing
date funds flow coming off the top directly
```

> to participants.  None of these institutions
> want to send eleven individual wires (or
> however many it is).  Which is of course how
> the participants will want it and how it
> will eventually happen in the real world.

110.   Dechert ignored this warning and did nothing to prevent the payment of

KEIP bonuses directly from the Debtor's estate.

111.   Once the bonuses were paid, Dechert knew it had a problem.  Dechert's

Sage wrote to his partner Greer on March 5, 2014:

> what concerns me is that the $2 mm **was paid
> by the estate** and not the 91%
>
> . . .
>
> at this point, the money is out the door.

(emphasis added).  Sage's reference to "the 91%" is to the Conspiring Bondholders, who

held 91% of the bonds.

112.   In response, Greer admitted the improper payment, but offered an

explanation:

> Estate paid as it needed to go through the
> payroll accounts

113.   Sage responded, again, to clarify the gravity of the improper payment:

> As to the 91% that is ugly.  I could see the
> Judge being pissed.

114.   The reason the judge would be "pissed" is that the Court did not authorize

the payments.  These were not routine payments of operating expenses in the ordinary

course of business.  These were extraordinary, one-time bonuses paid by insiders to

themselves from funds that belonged to creditors.  Court approval was absolutely

required, and Dechert knew it.

115.    Neither Sage nor Greer informed the Court.  Rather than honor their duty of candor to the Court and report obviously relevant facts, Dechert kept silent and hoped no one would notice the fraud they had just perpetrated on the Court and Constar's creditors.

**The Defendants Stonewall The Committee's Investigation**

116.    As part of the Committee Challenge investigation into which of Constar's assets were not subject to perfected security interests of the bondholders, the Committee also investigated the value of the assets that were outside of the bondholders' security interest.

117.    As discussed, the bondholders' lien did not cover all of the assets included in the sale, meaning that the portion of the sale proceeds attributable to those unencumbered assets belonged to unsecured creditors and not to the bondholders as such.

118.    The Committee's investigation necessarily relied on information controlled by the Conspiring Officers and other members of Constar's management. Management controlled Constar's books and records and was in the best position to help value Constar's assets.

119.    The Conspiring Officers had every incentive to obstruct the Committee investigation and to understate the value of unencumbered assets.  Their bonuses under the KEIP were tied directly to bondholder recoveries from the asset sale, and any value ascribed to unencumbered assets would cut directly into bondholder recoveries.

*Defendants Flaunt The Court's Order Compelling Production Of Documents*

120.    The Conspiring Officers' repeated refusal to provide requested documents led the Committee to file a motion to compel production of documents on January 23, 2014.  The Court granted the motion and entered an order without a hearing.

121.    CEO Imbrogno was disappointed at the Committee's persistence.   He wrote in an email to Dechert's Sage and Greer that he was:

> concerned with this group's aggressiveness

122.    After the Court's order, Dechert's Sage resorted to intimidation tactics.   In a letter to the Committee, Sage wrote:

> Please be advised that it is the Debtors'
> view that in a case of this nature, in which
> the prepetition secured debt was created
> through a prior bankruptcy, and there is no
> reasonably anticipated recovery to unsecured
> creditors other than through potential
> avoidance actions, the accrual of fees and
> expenses of such magnitude is excessive. . .
> . Please also be advised that the Debtors
> reserve all rights to object to Brown
> Rudnick's asserted fees and expenses.

123.    In the letter, Sage threatens to attempt to prevent the Committee's counsel, Brown Rudnick, from being compensated for its work.  Remarkably, Sage feigns outrage at what he assumes will be high fees and expenses from Brown Rudnick's investigation when Sage and his clients were *themselves* causing those fees and expenses to rise by obstructing the investigation.

124.    On February 3, 2014, the Committee submitted the Committee Challenge to the bondholders, including the Conspiring Bondholders.  As discussed, the Committee Challenge pointed out several asset classes, including the Foreign IP, that were unencumbered.

125.    On February 11, 2014, consultants hired by the Committee to estimate the value of the Foreign IP sent a request for information on the Foreign IP to the Debtor's financial advisors.  The financial advisors forwarded the request to CFO Borseth.

126.   CFO Borseth refused to provide the requested information and instead suggested that the Foreign IP was worthless.  CFO Borseth stated in an email that it was:

> ```
> pretty difficult to put a high value on the
> IP
> ```

127.   CFO Borseth knew that was not true.  The Foreign IP rights were included in the assets that Constar had just sold for a substantial amount.  Constar's own financial advisor admitted in emails that the Foreign IP rights were essential to operation of Constar's UK business, which was part of the assets that were sold.

128.   Dechert also knew it was not true.  In January 2014, Greer had emailed Sage to confirm his understanding that the unencumbered assets, including the Foreign IP, had value:

> ```
> It actually has a ton of unencumbered value
> to the extent someone will pay dollars for
> it.
> ```

(emphasis added).

129.   While CFO Borseth was stonewalling the Committee's consultants, Dechert was giving the Committee the runaround.  In response to the Committee's repeated requests for documents, Dechert directed the Committee to the "data room" that was previously set up for potential buyers as part of the asset sale process.  This was absurd.  The data room included vast amount of information totally irrelevant to the Committee Challenge.   Dechert, which just days before feigned outrage at the Committee's legal costs, set out to increase them exponentially by sending the Committee's professionals on a wild goose chase for information.

130.   Dechert's bad faith cannot seriously be questioned.   Dechert's unprofessional and inappropriate handling of the Committee's requests for information

demonstrate, in their own words, a clear desire to thwart the investigation and to make everything slower and more costly.

131.    On February 15, 2014, regarding a Committee request related to the data room, Greer emails Sage:

> `Are we complying?  I hope not.`

132.    On February 17, 2014, the Committee renewed its request.  Sage emailed Greer:

> `Keep stalling them.`

133.    On February 26, 2014, Sage and Greer discussed the scope of releases for insiders in the asset sale agreement.  Greer emailed Sage to note that a carve-out might limit the value of unencumbered claims that would yield "potential recovery for the gucs [general unsecured creditors]."  Sage's response shows his vehement hostility to Constar's unsecured creditors:

> `F them.  They deserve nothing and hassling`
> `our guys is the last piece of pie they`
> `should be able to get.  F them again.`

134.    In another example, responding to the news that Constar's officers would not meet the Committee's deadline to produce documents relevant to Foreign IP, Sage wrote:

> `Good. F Them.`

It is hard to imagine a more unprofessional attitude.  But far worse than a lack of professionalism, Dechert's actions to stonewall the Committee's investigation were directly harming Constar and its creditors by increasing costs for all parties.

*CFO Borseth's Misleading Interview Answers*

135.     On February 21, 2014, the Committee interviewed CFO Borseth.  Among other things, the Committee asked for information about the "success bonus" that Dechert had partially disclosed at the sale hearing and the potential value of the Foreign IP.

136.     Dechert anticipated the questioning and tried to prevent the interview. Dechert told Committee counsel that CFO Borseth would testify that the Foreign IP was "worthless" and that the Committee should "go home."  The Committee continued its investigation.

137.     At the interview, the Committee asked CFO Borseth for more information about the "success bonus."  This information was highly relevant to the investigation because, if truthful, it would have revealed Borseth's bias in favor of undervaluing the unencumbered assets.

138.     When asked for details about the "success bonus," CFO Borseth said:

> It is a success bonus.  My understanding is
> it gets carved out of the proceeds that go
> to the four largest bondholders and there is
> contingency   on   people   being   there   at
> closing.

139.     Like Dechert's half-disclosure to the Court during the sale hearing, CFO Borseth gave only a partial disclosure that was designed to keep the Committee from discovering the truth about the KEIP and its improper incentives.  CFO Borseth's coy phrasing – "my understanding is" – suggested only a passing familiarity with the KEIP. The limited explanation was absurd given CFO Borseth's intense and close involvement in negotiating the KEIP from before the bankruptcy filing.

140.     The Committee next asked CFO Borseth if he knew what his bonus would be.  CFO Borseth responded:

```
Yes, $350,000.
```

141.    CFO Borseth's answer was, again, misleading.  The answer suggested the he was entitled to a sum certain.  In reality, the KEIP included incentives that changed the amount of the bonus based on the Conspiring Bondholders' recovery.

142.    CFO Borseth gave no indication that the bonuses were contingent.  He knew exactly what he was doing.  He knew the Committee had no way of knowing about the improper incentives in the KEIP, and he knew that, if the Committee discovered the truth, it would object.

143.    CFO Borseth knew exactly what was at stake.  His bonus amount was contingent on minimizing the value ascribed to the unencumbered assets.  Six days before the interview, Dechert advised him directly about what the unencumbered assets were:

```
[The bondholders] did not perfect in foreign
ip and certain fixtures.
```

144.    The phrase "did not perfect" referred to the bondholders' failure to perfect their security interest in some of Constar's assets.  This was the basis of the Committee Challenge.  Dechert's reference to "foreign ip" was to Constar's foreign intellectual property rights.

145.    CFO Borseth, a sophisticated financial professional, knew that his bonus depended directly on valuing the "foreign ip" as low as possible.

146.    The ruse worked.  The Committee had no way of knowing that the success bonuses gave CFO Borseth an incentive to lie about the value of the Foreign IP, and the insider's stalling on responding to document requests made it even more difficult for the Committee to know the truth about the value of the Foreign IP.

**The Creditors Are Owed Substantial Damages**

147.    The Committee ultimately reached a settlement with the Conspiring Bondholders to compensate unsecured creditors for the value of the unencumbered assets. The settlement was for $1.4 million.  We now know that the settlement amount vastly undervalued the unencumbered assets.

148.    At the time of the settlement, the Committee had no way of knowing how unfair the settlement was because Dechert and the other Defendants had successfully stonewalled the investigation and flat out lied in response to direct questions.

149.    But Dechert knew.  In emails during the negotiation, Dechert called the proposed settlement amount "cheap."

150.    The Defendants' conduct not only deprived unsecured creditors from a fair share of the asset sale proceeds, but it also caused substantial harm to the Debtors' estates in the form of professional fees and costs caused by Dechert's unprofessional and unethical conduct, the Conspiring Officers' self-enrichment, and the Conspiring Bondholders' self-interested corruption of the sale price allocation process.

151.    This lawsuit is filed to make the creditors whole, and to hold the Defendants accountable for the fraud they knowingly committed on the creditors and this Court.

<u>**CAUSES OF ACTION**</u>

**Claim I.    <u>Breach of Fiduciary Duty against the Conspiring Officers</u>**

152.    Plaintiffs re-allege and incorporate each of the preceding paragraphs.

153.    Each of the Conspiring Officers were officers of Constar at all relevant times.

154.    Each of the Conspiring Officers owed fiduciary duties of care and loyalty to the Debtors by virtue of their positions as officers of Constar.

155.    The Conspiring Officers' fiduciary duties extended to Constar's creditors by virtue of the Debtor's insolvency at all relevant times.

156.    The Conspiring Officers' duty of loyalty included the duty to refrain from self-dealing.

157.    The Conspiring Officers' duty of care included the duty to prevent Constar management from engaging in self-dealing.

158.    Each of the Conspiring Officers breached his fiduciary duties by engaging in at least the following conduct:

a.    Self-dealing by pursuing the KEIP for their own personal financial benefit and to the detriment of Constar's creditors;

b.    Causing Constar to enter into the KEIP, which created incentives for Constar management to favor co-conspirators over Constar's creditors as a whole;

c.    Undervaluing the Foreign IP and other unencumbered assets in the asset sale to the detriment of creditors who received reduced allocations of proceeds; and

d.    Stonewalling the Committee's investigation into the KEIP and the value of Foreign IP and other unencumbered assets by concealing information, only partially disclosing information, and lying to the Committee and others.

159.    Each of the Conspiring Officers is jointly and severally liable for the harm his breaches of fiduciary duties caused the Debtors' creditors, including at least the following:

      a.    Causing the Debtors to incur substantial costs, including professional and other fees, in the pursuit of the KEIP;

      b.    Burdening the Debtors with the cost of making payments under the KEIP;

      c.    Depriving unsecured creditors of their fair portion of the asset sale proceeds; and

      d.    Causing the Committee to incur substantial professional and other expenses in investigating the Conspiring Officers wrongdoing.

**Claim II.    <u>Malpractice against Dechert</u>**

160.    Plaintiffs re-allege and incorporate each of the preceding paragraphs.

161.    Dechert was at all relevant times in an attorney-client relationship in which Constar and its estates were Dechert's clients.

162.    Dechert was never engaged to represent the Conspiring Officers or any other members of Constar's management personally.

163.    Dechert owed a duty to Constar and its estates to exercise the ordinary care of a reasonably competent attorney acting in the same or similar circumstances.

164.    Dechert breached its duty to exercise the ordinary care of a reasonably competent attorney in at least the following ways:

      a.    Pursuing the personal financial interests of the Conspiring Officers and other Constar management to the detriment of Constar by seeking the KEIP;

38                    **Original Complaint**

b.   Failing to advise Constar that the KEIP created incentives for Constar management to act adversely to Constar's creditors;

c.   Failing to advise Constar regarding the value of the Foreign IP and other unencumbered assets resulting in the under-valuation of those assets;

d.   Exposing Constar to potential liability by advising its management not to comply with discovery requests and Court orders compelling production; and

e.   Defrauding the Court and others by concealing the terms of the KEIP during the sale hearing.

165.    Dechert is liable for the harm caused to Constar by its professional negligence, including at least the following:

a.   Causing Constar to incur professional and other fees in the pursuit of the KEIP;

b.   Causing Constar's creditors to receive a reduced portion of the asset sale proceeds because of the undervaluation of the unencumbered assets; and

c.   Causing Constar to enter into the KEIP, resulting in the undervaluation of assets described above and the incurrence of bonus payments under the KEIP.

**Claim III.  <u>Excessive Costs under 28 U.S.C. § 1927 against Dechert</u>**

166.    Plaintiffs re-allege and incorporate each of the preceding paragraphs.

167.    Section 1927 of title 28 of the United States Code provides that:

**Original Complaint**

> Any attorney . . . who manipulates the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fee reasonably incurred because of such conduct.

168. Dechert was at all relevant times engaged as attorneys for Constar.

169. Dechert manipulated the proceedings in the Constar Cases unreasonably and vexatiously by engaging in at least the following conduct:

    a. Concealing the KEIP from the Court, the Committee, the Office of the US Trustee, and other parties in interest in the Constar Cases;

    b. Stonewalling the Committee's investigation into the KEIP and the value of the Foreign IP and other unencumbered assets;

    c. Aggressively pursuing untenable positions of no benefit to the Debtors in order to benefit the Conspiring Officers, such as Dechert's attempt to unnecessarily shorten auction timeline and its attempt to reject Black Diamond's DIP financing proposal; and

    d. Consistently engaging in a dilatory and unprofessional manner in dealings with the Committee's investigations.

170. Dechert is liable for at least the following costs and expenses incurred by Constar and the Committee as a result of Dechert's unreasonable and vexatious conduct:

    a. Professional and other fees incurred in connection with the asset sale process;

    b. Professional and other fees incurred in connection with the investigation into the KEIP and the value of the Foreign IP and other unencumbered assets;

    c.   Professional and other fees incurred in pursuing the instant action; and

    d.   Professional and other fees incurred in connection with the bankruptcy, the asset sale process, the Committee's investigation into the KEIP and the value of the Foreign IP and other unencumbered assets and the instant action.

**Claim IV.  <u>Aiding and Abetting Breach of Fiduciary Duty against Dechert</u>**

171.    Plaintiffs re-allege and incorporate each of the preceding paragraphs.

172.    The Conspiring Officers breached their fiduciary duties to Constar.

173.    Dechert knew that the Conspiring Officers had fiduciary duties.

174.    Dechert provided substantial assistance to the Conspiring Officers in breaching their fiduciary duties by engaging in at least the following conduct:

    a.   Helping the Conspiring Officers pursue the KEIP;

    b.   Helping the Conspiring Officers prevent the Committee from investigating the KEIP;

    c.   Helping the Conspiring Officers undervalue the Foreign IP and other unencumbered assets; and

    d.   Helping the Conspiring Officers to conceal the KEIP from the Court and the Committee.

175.    Dechert's actions in furtherance of the Conspiring Officers' breaches of fiduciary duties to Constar were egregious and knowing.

176.    Dechert is jointly and severally liable with the Conspiring Officers for the harm caused by their breaches of fiduciary duty for which Dechert provided substantial assistance.

**Claim V.**   **Aiding and Abetting Breach of Fiduciary Duty against Conspiring Bondholders**

177.   Plaintiffs re-allege and incorporate each of the preceding paragraphs.

178.   The Conspiring Officers breached their fiduciary duties to Constar.

179.   The Conspiring Bondholders knew that the Conspiring Officers had fiduciary duties.

180.   The Conspiring Bondholders provided substantial assistance to the Conspiring Officers in breaching their fiduciary duties by engaging in at least the following conduct:

a.   Helping the Conspiring Officers pursue the KEIP; and

b.   Inducing the Conspiring Officers to structure the KEIP so that the Conspiring Officers would have an incentive to undervalue the Foreign IP and other unencumbered assets.

181.   The Conspiring Bondholders' actions in furtherance of the Conspiring Officers breaches of fiduciary duties to Constar were egregious and knowing.

182.   The Conspiring Bondholders are jointly and severally liable with the Conspiring Officers for the harm caused by their breaches of fiduciary duty for which the Conspiring Bondholders provided substantial assistance.

**Claim VI.   Objection to Final Allowance of Dechert's Fees under 11 U.S.C. § 327**

183.   Plaintiffs re-allege and incorporate each of the preceding paragraphs.

184.   Dechert was employed under 11 U.S.C. § 327 as counsel to the Debtors in the Constar Cases.

185.   Throughout the cases, Dechert filed applications for interim payment of fees for services and reimbursement of expenses incurred on behalf of the Debtors.

186.    To date, Dechert received $1,521,606.00 in fees and $22,483.14 in expense reimbursements from the Debtors' estates.

187.    Dechert is only entitled to reasonable compensation for fees for services undertaken for the benefit of the Debtors.

188.    Compensation for services that harm the Debtors is not reasonable.

189.    The Court has discretion to determine the amount of fees to which a professional person employed under section 327 is entitled.

190.    Dechert's egregious conduct, including professional negligence and perpetrating a fraud on this Court warrant denial of all professional fees and disgorgement of fees paid previously on an interim basis.

**Claim VII. <u>Avoidance and Recovery of Unnecessary Fees under 11 U.S.C. § 329</u>**

191.    Plaintiffs re-allege and incorporate each of the preceding paragraphs.

192.    Under 11 U.S.C. § 329 the Court has the ability to reach back to the pre-petition period and require the repayment of fees to the Debtors of those Debtor payments made for matters that were not undertaken for the benefit of the Debtors.

193.    Dechert expended a substantial amount of time, effort, and fees both pre- and post-petition in an effort to enact a KEIP for the benefit of the Conspiring Officers and the Conspiring Bondholders.

194.    The KEIP sought and obtained by Dechert aligned the personal financial interests of the Conspiring Officers and the Conspiring Bondholders, and cemented those interests together against the interests of the Debtors and the Debtors' unsecured Creditors.

195.    Dechert charged the Debtors for these services even though the legal work performed by Dechert in this regard was against the interests of Debtors and their general unsecured creditors.

196.    Dechert must be required to disgorge the $200,000 pre-petition advance retainer it received, and all pre-petition fees paid by the Debtors for the benefit of the Conspiring Officers and the Conspiring Bondholders and against the interests of the Debtors in an amount to be determined at trial.

**Claim VIII.    Equitable Subordination of Claims of the Conspiring Bondholders**

197.    Plaintiffs re-allege and incorporate each of the preceding paragraphs.

198.    The Court has the authority to subordinate all or part of a claim under principles of equitable subordination.  11 U.S.C. § 510(c)(1).

199.    The Conspiring Bondholders acted inequitably throughout the Constar Cases in at least the following ways:

    a.   Inducing the Conspiring Officers and other Constar management to enter into a KEIP that gave incentives to Constar management to undervalue the Foreign IP and other unencumbered assets for the direct benefit of the Conspiring Bondholders and to the detriment of unsecured creditors;

    b.   Conspiring to withhold information about the KEIP from the Court and others to prevent a proper adjudication of the merits of the KEIP;

    c.   Aiding and abetting the Conspiring Officers' breaches of fiduciary duties; and

    d.  Abusing and undermining the bankruptcy process by misleading the Court and others regarding the KEIP and the distribution of asset sales proceeds.

200.    The claims of the Conspiring Bondholders should be subordinated to the priority of equity interests.

## Claim IX.  <u>Sanctions against All Defendants</u>

201.    Plaintiffs re-allege and incorporate each of the preceding paragraphs.

202.    The Court has the inherent power to levy sanctions for bad faith conduct.

203.    The Court has the power to penalize those who abuse the judicial process.

204.    Sanctions serve not only to punish wrongdoers, but also the deter those who might be tempted to engage in such conduct in the future.

205.    Each of the Defendants engaged in outrageous conduct that merits sanctions, including at least the following bad acts:

    a.  All of the Defendants defrauded the Court by failing to disclose the KEIP and, in fact, actively coordinated their efforts to conceal from the Court the terms of a KEIP they knew the Court would never approve;

    b.  Dechert, as officers of the Court, debased the legal profession not only by concealing the KEIP, which itself violated the duty of candor and undermined the judicial process, but also by placing its client's individual officers' financial interests above the interests of the client itself.

206.    Sanctions of three times the amount of actual damages found against each of the Defendants is an appropriately punitive and deterrent remedy.

## PRAYER FOR RELIEF

Wherefore, the Plaintiffs seek judgment as follows:

1.  Awarding sanctions against all Defendants in an amount sufficient to deter such egregious and detrimental conduct (including fraud on this Court and corruption of these judicial proceedings) in the future;

2.  Awarding the Plaintiffs, for the benefit of the Estates, damages in an amount to be proven at trial but no less than $20 million, jointly and severally against all of the Defendants;

3.  Awarding the Plaintiffs, for the benefit of the Estates, such punitive or exemplary damages as are permitted by law or equity;

4.  Disallowing all fees charged in Dechert's representation of the Debtors in the Chapter 11 cases and denying approval of reimbursements for Dechert's allegedly actual and necessary expenses;

5.  Disgorging fees paid to Dechert following commencement of Constar's Chapter 11 cases in the amount of $1,521,606.00 in fees paid and expenses paid in the amount of $22,483.14;

6.  Providing for the recovery against Dechert, under 11 U.S.C. § 329, of pre-petition fees paid by the Debtors in an amount to be determined at trial and the return of $200,000 advance retainer;

7.  Equitably subordinating the claims of the Bondholders to all other claims against the Debtors' estates;

8.  Awarding the Plaintiffs, for the benefit of the Estates, prejudgment interest in the maximum amount allowed by law pursuant to federal common law;

9.  Awarding the Plaintiffs, for the benefit of the Estates, all applicable interest, costs, and disbursements entailed in bringing this action; and

10. Awarding the Plaintiffs, for the benefit of the Estates, such other relief that this Court deems just and proper.

*[signature page follows]*

Dated: June 9, 2015
      Wilmington, DE

GELLERT SCALI BUSENKELL &
BROWN LLC

*/s/Michael G. Busenkell*            
Michael G. Busenkell (No. 3933)
913 N. Market St., 10th Floor
Wilmington, DE 19801
Telephone: (302) 425-5812
Facsimile: (302) 425-5814
Email: mbusenkell@gsbblaw.com

*Delaware Counsel to the Official
Committee of Unsecured Creditors*

BAYARD, P.A.

*/s/ Evan T. Miller*            
Charlene D. Davis (No. 2336)
Evan T. Miller (No. 5364)
222 Delaware Avenue, Suite 900
Wilmington, DE 19801
Telephone: (302) 655-5000
Facsimile: (302) 658-6395
E-mail:cdavis@bayardlaw.com
        emiller@bayardlaw.com

*Counsel to the Debtors and Debtors in
Possession*

DIAMOND McCARTHY LLP
Allan B. Diamond (*admitted pro hac vice*)
Christopher R. Murray, Esq. *(admission pro
hac vice pending)*
Benjamin R. Garry, Esq. *(admission pro hac
vice pending)*
909 Fannin Street, 15th Floor
Houston, TX  70010
Telephone: (713) 333-5100
Facsimile: (713) 333-5199
E-mail:adiamond@diamondmccarthy.com
        cmurray@diamondmccarthy.com
        bgarry@diamondmccarthy.com

*Special Litigation Counsel to the
Debtors and the Official Committee of
Unsecured Creditors*